**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Nuevos Destinos, LLC, et al., | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:19-cv-00045 |
| | ) | |
| Samuel Peck, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## I.    <u>INTRODUCTION</u>

This case caught a second wind in North Dakota after its transfer from the U.S. District Court for the District of Columbia.  The complaint alleges that 21 Defendants, nine of which have entered appearances, engaged in a racketeering scheme to defraud the Plaintiffs and others of millions of dollars—in Peru. The Plaintiffs contend that the Defendants operated a de facto Ponzi scheme with Peruvian businesses dealing in agricultural goods, ripping off investors and then, with the promise of repaying past losses, enlisting those same investors to recruit new victims.

The complaint includes five counts: (1) violation of 18 U.S.C. § 1962(c), otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) conspiracy to violate RICO under 18 U.S.C. § 1962(d); (3) conspiracy to commit fraud; (4) fraud; and (5) breach of contracts.  In eight separate motions, each of the nine appearing Defendants has moved to dismiss predicated on either lack of jurisdiction or failure to state a claim or both.  Doc. Nos. 133-38, 141-42.  In turn, the Plaintiffs have moved for permission to conduct jurisdictional discovery.  Doc. No. 129.  The parties have exhaustively briefed the issues (essentially twice now), and the Court has weighed all the arguments presented in this forum and the District of Columbia.  For the

reasons below, the Defendants' eight motions to dismiss are granted. The Plaintiffs' motion to conduct jurisdictional discovery is concomitantly denied.

## II.   <u>BACKGROUND</u>

As it must at the motion to dismiss stage, the Court accepts the complaint's factual allegations as true. <u>See</u> Doc. No. 1. Considering the number of defendants, a brief introduction of the parties is necessary at the outset. A summary of the allegations in the complaint and a synopsis of the procedural history follows.

### A.   **Introduction of Parties**

The Plaintiffs are two business entities and one individual. Nuevos Destinos, LLC ("NDL") is a limited liability company registered in Florida that purchases agricultural goods in Peru and exports them to the United States and elsewhere. <u>Id.</u> ¶ 9. Its principal place of business during the time period relevant to this lawsuit was the District of Columbia. <u>Id.</u> Nuevos Destinos Peru, S.A.C. ("NDP") is a business entity organized in Peru that "purchased agricultural products from Peru on behalf of NDL" as its agent. <u>Id.</u> ¶ 10. Like its American counterpart, NDP's principal place of business was the District of Columbia. <u>Id.</u> William P. Cook ("Cook"), a citizen of Virginia, is the individual plaintiff. <u>Id.</u> ¶ 11. Cook "personally financed" the transactions at issue and is a principal of NDL along with his wife, Ileana M. Boza, a U.S. permanent resident from Peru. <u>Id.</u> ¶¶ 9, 11.

Because most of the named Defendants have yet to appear, the Court will primarily discuss the nine Defendants that have responded to the claims through the pending motions. With that said, three Defendants that have not appeared warrant introduction for context because of their centrality to the claims. The first is Ignacio Harten Rodriguez Larrain ("Harten"), the alleged

"central mastermind" of the purported racketeering enterprise.  <u>Id.</u> ¶ 13.  He is a citizen of Peru that may currently be living in the United States.  <u>Id.</u>  Second is Agricola Peruana Del Sol, S.R.L. ("APS"), a now defunct Peruvian business entity controlled by Harten as its General Manager that exported agricultural goods from Peru to the United States and abroad.  <u>Id.</u> ¶¶ 13, 15.  As alleged, APS served as the vehicle through which Harten and the other Defendants defrauded the Plaintiffs. <u>Id.</u>  And third is Peruvian Organic International Trading, S.A.C. ("POIT"), the "successor in interest" to APS and an asserted wellspring of continued fraudulent activity that Harten covertly runs.  <u>Id.</u> ¶ 23.

The appearing Defendants consist of one United States citizen, one United States corporation, five Peruvian citizens, and two Peruvian business entities.  Chief among them is Samuel Peck ("Peck"), who along with Harten is alleged to have been the racketeering scheme's primary architect.  <u>Id.</u> ¶ 12.  Peck co-founded APS with Harten and was the company's majority shareholder.  <u>Id.</u>  A citizen of Colorado, he is also the Vice President of SKE Midwestern, Inc. ("SKE"), another named Defendant.  <u>Id.</u>  SKE, an agricultural export corporation that is incorporated and has its principal place of business in North Dakota, lost millions to Harten in a previous business deal gone bad.  <u>Id.</u> ¶ 17.  Peck and Harten allegedly used APS to recoup SKE's losses through further fraud.  <u>Id.</u>

Moving to the Peruvian Defendants,[1] Emilio Farah ("Farah"), another former victim of Harten's fraudulent machinations and a citizen of Peru, sought to sell agricultural products with NDL and first introduced Cook to Harten.  <u>Id.</u> ¶ 16.  Farah is also the purported principal of

---

[1] "Peruvian Defendants" refers to the seven appearing Defendants other than Peck and SKE.

Defendants Convalor, S.A.C. ("Convalor") and Confactor, S.A.C. ("Confactor"), two Peruvian business entities. <u>Id.</u>

The remaining Defendants, collectively referred to as "the Costa Defendants," are all individual Peruvian citizens and members of Harten's family. Jorge Harten Costa, Sr. ("Jorge, Sr.") is Harten's father and served as a designated agent for APS, meaning his signature was required—at least initially—for Harten to access the company's funds. <u>Id.</u> ¶ 20. Harten's brother, Jorge Emilio Harten Rodriguez Larrain, Jr. ("Jorge, Jr."), was also a designated agent for APS and is now a shareholder in POIT. <u>Id.</u> ¶¶ 21, 23. Ofelia Maria Rodriguez Larrain Salinas de Harten ("Ofelia") is Harten's mother and Jorge, Sr.'s wife. <u>Id.</u> ¶ 22. Ofelia is allegedly POIT's "nominal public head." <u>Id.</u> Last is Javier Rodriguez Larrain Salinas ("Javier"), Ofelia's brother and Harten's uncle. <u>Id.</u> ¶ 24. Javier attended the initial meeting between Cook and Harten and propped up APS's legitimacy to NDL after having fallen victim to the scheme himself. <u>Id.</u>

## B. Alleged Racketeering Activity

The claimed racketeering enterprise took form in 2007 after Peck started doing business with Harten on behalf of SKE. <u>Id.</u> ¶ 67. Allegedly a "compulsive gambler and former drug addict" who "owed money to a number of Lima's casinos," Harten quickly proved a less than trustworthy business associate. <u>Id.</u> ¶ 72. Peck and Harten then formed APS so that SKE could "exercise control over Harten" in future business dealings. <u>Id.</u> ¶ 67.

Harten initially held only a small ownership interest in APS, while Peck and two other U.S. citizens owned the remainder. <u>Id.</u> ¶ 68. Jorge, Sr., a lawyer, chartered APS with "safeguards" designed to constrain Harten's control over the company's funds. <u>Id.</u> ¶ 69. Specifically, Jorge, Sr., Jorge, Jr., and Peck oversaw APS's operations as "Apoderados" (designated agents) and had

to authorize any checks issued or cash withdrawn from company accounts.  <u>Id.</u>  With the safeguards in place, SKE then moved forward with a $1 million purchase of agricultural goods from APS.  <u>Id.</u> Not long after, APS "ceased delivering product entirely."  <u>Id.</u> ¶ 70.  By May 2011, SKE had paid APS $3.6 million with little to nothing to show for it.  <u>Id.</u> ¶ 74.  SKE's President then told Peck "that his job was on the line and to do whatever it took to get [SKE's] money back from APS and Harten."  <u>Id.</u> ¶ 73.

In response, APS reorganized.  Jorge, Sr. removed entirely the prior restrictions on Harten's access to the company's funds, "making Harten the sole signatory on all of the APS accounts" in July 2011.  <u>Id.</u> ¶ 77.  Harten's ownership share increased in tandem to almost 50%, a move Peck characterized as "necessary to 'incentivize Harten' to work to recover SKE's lost $3.6 million." <u>Id.</u> ¶¶ 74-75.  Peck remained the majority shareholder, with the other two U.S. citizens' shares becoming effectively nonexistent.  <u>Id.</u> ¶ 75.

Untethered from corporate restraints, Harten and Peck devised the scheme that would ultimately ensnare the Plaintiffs.  The plan called for Peck to "issue facially valid purchase orders on behalf of SKE and then Harten would shop them around to financing sources in Lima and abroad."  <u>Id.</u> ¶ 76.  Harten and Peck allegedly sold the purchase orders to investors with no intent of delivering product, pocketing the proceeds to repay SKE and strong-arming victims into joining the scheme with similar promises of eventual recompense.  The scheme's first victims were Harten's own family members, including his uncle, Javier, who lost $500,000.  <u>Id.</u> ¶ 79.  Peruvian businessmen such as Farah, who lost $1.5 million, made for later targets.  <u>Id.</u> ¶¶ 80-81.

NDL entered the picture in 2012.  <u>Id.</u> ¶ 32.  Up to that point, NDL had financed other export companies in Peru.  <u>Id.</u> ¶ 31.  Beginning that year, however, NDL ventured into the export business

directly. Id. To facilitate a potential business relationship, Farah introduced NDL to Harten in Peru in April 2012. Id. ¶ 32. Farah told NDL that "he had a good experience with Harten and APS" from a recent contract and that Harten was "honest" and "well connected." Id. Shortly thereafter in May, NDL met Peck and Harten at a lunch in Lima. Id. ¶ 88. Peck identified himself as an SKE employee and told NDL "that he had worked for a long time with Harten and APS, and Peck was very pleased with the relationship." Id. At no time during this meeting did Peck identify himself as a co-founder or majority shareholder of APS. Id. ¶ 91. Harten's family members, including Jorge, Sr. and Javier, also extolled Harten's reputation as an honest businessman. Id. ¶¶ 102-06, 112.

NDL inked its first contract with APS that same month to purchase 1566.6 metric tons of product for $1,584,600. Id. ¶¶ 36-37. APS delivered less than 64 metric tons. Id. ¶ 37. Despite the rocky start, NDL entered into several more contracts with APS spanning from May through October 2012. Id. ¶¶ 45, 47, 58, 64-65. NDL's commitment rested in part on the belief that "APS had specific purchase orders, including [from] SKE (which NDL later found out to be largely false)." Id. ¶ 37. Repeated attempts to obtain the promised product or an accounting for the money NDL paid to Harten and APS proved futile. Id. ¶¶ 128-30.

After catching on to the scheme, NDL successfully warned another Peruvian businessman to steer clear of APS, Harten, and Peck in early 2013 when they attempted to use similar tactics to entice the businessman to provide financing. Id. ¶ 82. Peck and Harten folded APS in reaction, and Harten's family then created POIT. Id. ¶ 83. While Jorge, Jr. and Ofelia are POIT's only shareholders, Harten allegedly runs the business to perpetuate the fraudulent activity and repay APS's debts. Id. Peck is also working with POIT. Id. He has purportedly "forced Harten to repay

6

SKE with NDL's money" and remains employed as SKE's Vice President.  Id. ¶ 93.  All told, NDL claims it poured $2.25 million into the deals with APS, with only $238,907 in product ever delivered.  Id. ¶ 193.  The Plaintiffs seek damages to the tune of $2,011,093,[2] as well as damages for unspecified lost business opportunities.  Id. ¶¶ 192-93.

### C.    Procedural History

As noted above, this case presents with an unusual procedural posture.  The Plaintiffs initially filed their complaint in the U.S. District Court for the District of Columbia on October 30, 2015.  See Doc. No. 1.  In retort, the nine Defendants that entered appearances uniformly moved to dismiss the complaint for lack of jurisdiction, among other grounds.  Doc. Nos. 35-38, 45, 50, 52, 54.  On January 2, 2019, District Judge Emmet G. Sullivan issued an order and accompanying memorandum opinion dismissing all nine Defendants for lack of jurisdiction in the District of Columbia.  Doc. Nos. 113, 114.  However, Judge Sullivan later stayed that order, finding that transfer, instead of dismissal, was more appropriate based predominantly on SKE and Peck's contacts with North Dakota.  See Minute Order, Feb. 22, 2019.  Following the transfer, the Plaintiffs moved to conduct jurisdictional discovery.  Doc. No. 129.  Meanwhile, the nine appearing Defendants renewed their motions to dismiss.  Doc. Nos. 133-38, 141-42.

## III.    JURISDICTION OVER PERUVIAN DEFENDANTS

The Court first finds that it is without jurisdiction to consider the claims against the seven Peruvian Defendants.[3]  Jurisdiction is the "first and fundamental question" for resolution.  Franklin

---

[2] RICO permits injured plaintiffs to recover treble damages.  18 U.S.C. § 1964(c).

[3] SKE states in its pending motion to dismiss that it no longer contests jurisdiction as it did in the District of Columbia.  Doc. No. 138.  Although Peck does not specifically disclaim a lack of jurisdiction defense, his decision not to raise the issue in his renewed motion to dismiss operates as a waiver.  See Fed. R. Civ. P. 12(h)(1)(A).

v. Peterson, 878 F.3d 631, 635 (8th Cir. 2017) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998)).  As an initial barrier, the Plaintiffs improperly served the Peruvian Defendants under the Federal Rules of Civil Procedure.  In addition, the Court wholly lacks personal jurisdiction over citizens of Peru for events that occurred in Peru.  Jurisdictional discovery will not cure this fundamental shortcoming and is consequently inappropriate.  Because jurisdiction is a threshold inquiry, the Court will not address the merits of the Plaintiffs' claims against these seven Defendants.  See Va. House of Delegates v. Bethune-Hill, 587 U.S. ___, 139 S. Ct. 1945, 1950 (2019) ("To reach the merits of a case, an Article III court must have jurisdiction.").

### A.      Improper Service of Process

The Peruvian Defendants initially contend that the Plaintiffs improperly served them with process under the Federal Rules of Civil Procedure.  "If a defendant is improperly served, a federal court lacks jurisdiction over the defendant." Bell v. Pulmosan Safety Equipment Corp., 906 F.3d 711, 714-15 (8th Cir. 2018) (quoting Printed Media Servs., Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993)).  Service must be carried out in compliance with the Federal Rules and "[t]his principle remains true despite any actual notice a defendant may have of the lawsuit." Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982) (citations omitted).

The proof of service forms the Plaintiffs filed indicate that all seven Peruvian Defendants received notice of the summons and complaint via delivery of notarized letters, written in English, to third parties in Peru.  Doc. Nos. 18-21, 23-24, 26.  Process was served on receptionists at places of business for six Defendants (Jorge, Sr., Ofelia, Javier, Farah, Convalor, and Confactor) and on a family member at a residence for one Defendant (Jorge, Jr.).  See id.  Nothing in the record

indicates that the Defendants had designated the served individuals as agents for receipt of service of process.

Federal Rule 4(f) delineates the standard for service of process on an individual in a foreign country:

> (f) Unless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States:
>> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>>> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>>> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>>> (C) unless prohibited by the foreign country's law, by:
>>>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>>>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>> (3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f). The requirements for serving a corporation in a foreign country are the same, with one caveat – delivering a copy of the summons and complaint "personally" to a corporation under Rule 4(f)(2)(C)(i) is ineffective. See Fed. R. Civ. P. 4(h)(2). Walking through Rule 4(f) yields the conclusion that the Plaintiffs' chosen method of service was inadequate.

Starting with Rule 4(f)(1), Peru is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. See SA Luxury Expeditions, LLC v. Latin Am. for Less, LLC, No. C 14-04085, 2015 WL 4941792, at *1 (N.D. Cal. Aug. 19, 2015). The United States and Peru are, however, joint signatories to the Inter-American Convention on Letters

Rogatory, as well as the Additional Protocol to that Convention. Id. The Plaintiffs did not effect service using letters rogatory here. Because service was not attempted pursuant to the Inter-American Convention, which is the only international agreement between the United States and Peru regarding service, Rule 4(f)(1) is not satisfied.

Even so, "the Inter-American Convention does not purport to provide the exclusive method of effecting service between the signatories." C & F Systems, LLC v. Limpimax, S.A., No. 1:09-cv-858, 2010 WL 65200, at *1 (W.D. Mich. Jan. 6, 2010) (citing Kreimerman v. Casa Veerkamp, S.A. de C.V., 22 F.3d 634, 643-44 (5th Cir. 1994)). This cracks the door open to Rule 4(f)(2) because the Inter-American Convention "allows but does not specify other means" for service. Fed. R. Civ. P. 4(f)(2). Rule 4(f)(2) lists, for practical purposes, four additional avenues available to effectuate service on foreign defendants.

First is subsection (A), permitting any method "prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A). The parties dispute Peru's service of process requirements via dueling declarations. On one hand, the Plaintiffs assert that "the only applicable law of Peru to this matter is Article 2094 of the Peruvian Civil Code." Doc. 64-9, p. 3. That Peruvian Civil Code section provides simply that a foreign procedural instrument is governed "by the law of the place of its origin," in essence reflecting back to American law. Id. The Defendants, on the other hand, collectively posit three requirements for service in Peruvian courts. Namely, notice of the claim, here consisting of the summons and complaint, must be: (1) processed by a Peruvian court; (2) delivered to a defendant's domicile; and (3) accompanied by an official translation if not originally written in Spanish. Doc. No. 35-2, pp. 4-5; Doc. No. 52-2, p. 5.

When resolving an issue of foreign law, a "court may consider any relevant material or source." Fed. R. Civ. P. 44.1; see also United States v. Larson, 110 F.3d 620, 627 n.7 (8th Cir. 1997). After carefully examining the submitted declarations from both parties, the Court finds the Defendants' interpretation of Peruvian law most accurate.

As relevant here, Rule 4(f)(2)(A) looks to "[Peru's] law for service . . . in an action in [Peru's] courts of general jurisdiction." Fed. R. Civ. P. 4(f)(2)(A). Article 2094 of the Peruvian Civil Code has nothing to do with this analysis. In a word, how Peru's courts treat other countries' procedural documents is irrelevant to how Peru's courts require service in their own lawsuits. Even if American law is in fact what a Peruvian court would turn to, what would that American law be? Well, Federal Rule of Civil Procedure 4(f), which again would call for application of Peru's own law for service in its own courts. The result is a hamster wheel. Because Article 2094 misses the mark, the Court rejects the Plaintiffs' interpretation.

Instead, the Court finds that to properly serve a defendant in an action before a court of general jurisdiction in Peru, notice of the claim must be: (1) processed by a Peruvian court; (2) delivered to a defendant's domicile; and (3) accompanied by an official translation if not originally written in Spanish. See Doc. No. 35-2, pp. 4-5; Doc. No. 52-2, p. 5. A Peruvian court had not processed the notarized letters the Plaintiffs' employed here, nor were the letters accompanied by Spanish translations of the summons and complaint. And four of the Defendants (Jorge, Sr., Ofelia, Javier, and Farah) were not served at their domicile, but rather at a place of business. See Doc. Nos. 20, 21, 24, 26. Service was therefore ineffective under Peruvian law and Rule 4(f)(2)(A).

Subsections (B) and (C) of Rule 4(f)(2) are equally inapplicable. As stated above, the Plaintiffs did not attempt to use letters rogatory under subsection (B). Also lacking for all seven Peruvian Defendants is personal delivery pursuant to Rule 4(f)(2)(C)(i). Personal delivery is unavailable as a method of service for Convalor and Confactor as foreign corporations. See Fed. R. Civ. P. 4(h)(2). Moreover, the five individual Peruvians were not served personally – the process server delivered four notarized letters to receptionists at places of business and one to a Defendant's family member. See Doc. Nos. 20-21, 23-24, 26. Finally, under Rule 4(f)(2)(C)(ii), the Plaintiffs did not attempt to serve the Defendants using mail addressed and sent by a Clerk of Court's office.

That leaves only Rule 4(f)(3), allowing for service pursuant to court order. The Plaintiffs have not moved for such an order in this forum. But in their omnibus response to the pending motions to dismiss, the Plaintiffs contend that "even if there was some [service] defect, it was minor and non-prejudicial" and they should be allowed a second chance to properly serve the Defendants. Doc. No. 154, p. 13.

The Court declines to entertain this eleventh hour request for a do-over more than four years into the litigation. District courts possess "discretion to determine 'when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3).'" TracFone Wireless, Inc. v. Washington, 290 F.R.D. 686, 687-88 (M.D. Fla. 2013) (quoting Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002)). Despite the manifold avenues for proper service available under Rule 4, the Plaintiffs made a single attempt to serve the Peruvian Defendants that patently did not comply with any of them. More importantly, permitting a second round of service would do nothing to change the inevitable outcome—that there is no basis to

12

exercise jurisdiction over the Peruvian Defendants—and result only in further unwarranted delay. The Court therefore, in the exercise of its discretion, will not permit alternative service.

In sum, the Plaintiffs failed to properly serve the Peruvian Defendants with process under Rule 4 of the Federal Rules of Civil Procedure. The Court accordingly lacks jurisdiction over them. In any event, and even if service had been proper, the Court cannot constitutionally exercise personal jurisdiction over the Peruvian Defendants.

### B.    Lack of Personal Jurisdiction

Over and above improper service of process,[4] the seven Peruvian Defendants argue that the Court lacks personal jurisdiction over them, thereby mandating their dismissal pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Albeit in a roundabout way, the Plaintiffs put forth three independent grounds for personal jurisdiction. To start, the Plaintiffs claim generally that the Defendants have sufficient contacts with North Dakota. They also rely on Federal Rule of Civil Procedure 4(k)(2), the federal long-arm statute that permits jurisdiction when there is a supporting federal claim and a defendant lacks contacts with a specific forum. The last asserted basis is 18 U.S.C. § 1965(b), RICO's nationwide personal jurisdiction provision.

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that personal jurisdiction exists." K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 591 (8th Cir. 2011) (citing Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1072 (8th Cir. 2004)). This prima facie showing is established "not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." Miller v. Nippon Carbon Co., Ltd., 528 F.3d 1087, 1090 (8th Cir. 2008) (quoting Dever, 380 F.3d at 1072). When

---

[4] To squarely address personal jurisdiction, the Court will assume, for Part III.B. only, that the Plaintiffs properly served the Peruvian Defendants.

a defendant challenges personal jurisdiction, the plaintiff "carries the burden of proof, and the burden does not shift to the party challenging jurisdiction." Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003). Absent a hearing or trial, the evidence must be viewed in the light most favorable to the Plaintiffs. Creative Calling Solutions, Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015) (citing Radaszewski ex rel. Radaszewski v. Telecom Corp., 981 F.2d 305, 309-10 (8th Cir. 1992); Fed. R. Civ. P. 56(a)).

1.   North Dakota Long-Arm Statute

The complaint's lone allegation supporting jurisdiction in this forum specifically is that the racketeering enterprise operated in North Dakota, as well as in the District of Columbia and Peru. Doc. No. 1, ¶ 150. Indeed, the Plaintiffs have not even so much as hinted that jurisdiction is proper under North Dakota's long-arm statute since this case's transfer. And for good reason; each Peruvian Defendant lacks the requisite minimum contacts with North Dakota.

The exercise of personal jurisdiction is appropriate if a two-part test is met. First, a defendant must fall within the ambit of the relevant forum's long-arm statute. Dever, 380 F.3d at 1073 (citing Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991)). Second, a defendant must have sufficient minimum contacts with the forum under the Due Process Clause of the Fourteenth Amendment. Id.

Unless statutory authority provides otherwise, a federal court exercises personal jurisdiction to the same extent as "a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A); see also Coen v. Coen, 509 F.3d 900, 905 (8th Cir. 2007) (citing Dakota Indus., Inc. v. Ever Best Ltd., 28 F.3d 910, 915 (8th Cir. 1994)). The North Dakota long-arm statute "authorizes North Dakota courts to exercise personal jurisdiction over nonresident

14

defendants to the fullest extent permitted by due process." Hansen v. Scott, 2002 ND 101, ¶ 16, 645 N.W.2d 223. When a state's "long-arm statute is coextensive with constitutional limits, [courts] need only determine whether the assertion of jurisdiction . . . offends due process." Johnson v. Woodcock, 444 F.3d 953, 955 (8th Cir. 2006) (citing Minnesota Mining & Mfg. v. Nippon Carbide Indus., 63 F.3d 694, 696-97 (8th Cir. 1995)).

To comport with due process, "the defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). "Each defendant's contacts . . . must be assessed individually." Calder v. Jones, 465 U.S. 783, 790 (1984) (citing Rush v. Savchuk, 444 U.S. 320, 332 (1980)). There are two categories of personal jurisdiction: general jurisdiction and specific jurisdiction. Daimler AG v. Bauman, 571 U.S. 117, 127 (2014). To establish general jurisdiction, a defendant's contacts with the forum must be "so 'continuous and systematic' as to render them essentially at home in the forum." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (quoting Int'l Shoe, 326 U.S. at 317). Alternatively, specific jurisdiction exists when the suit "arises out of or relates to the defendant's contacts with the forum." Daimler, 571 U.S. at 127 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984)) (alterations omitted).

At a more granular level, the Eighth Circuit Court of Appeals has established a five-factor test for measuring minimum contacts for purposes of asserting personal jurisdiction over a defendant:

> (1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4)

the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

Dever, 380 F.3d at 1073-74 (alterations omitted).  In applying this test, courts must consider "all of the factors in the aggregate and examine the totality of the circumstances."  Johnson v. Arden, 614 F.3d 785, 794 (8th Cir. 2010) (citing Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995)).  With that in mind, the Eighth Circuit lends "significant weight" to the first three factors.  Romak USA, Inc. v. Rich, 384 F.3d 979, 984 (8th Cir. 2004).

All five factors weigh against the exercise of personal jurisdiction over the Peruvian Defendants.  The Plaintiffs contend that the RICO enterprise operated in North Dakota, presumably through its connection with SKE and Peck.  The record contains some correspondence between SKE and Harten, acting on APS's behalf, that appears to have been sent to auditors in Fargo.  Doc. No. 64-7.  Other than that, there are no specific allegations that Convalor, Confactor, the Costa Defendants, or Farah have any contacts with North Dakota.  Naturally enough, the Plaintiffs did not claim jurisdiction was proper in North Dakota when this case began in the District of Columbia.  But even since transfer, their filings regarding jurisdictional discovery and the pending motions to dismiss have avoided mentioning the Peruvian Defendants' contacts with North Dakota altogether.

Turning to the Eighth Circuit factors, when examining the nature and quality of contacts with the forum, the primary consideration is whether a nonresident defendant has "fair warning that a particular activity may subject a person to the jurisdiction of a foreign sovereign."  Gould v. P.T. Krakatau Steel, 957 F.2d 573, 576 (8th Cir. 1992) (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)).  None of the Peruvian Defendants has ever set foot in North

Dakota. <u>See</u> Doc. Nos. 133-1, 134-2, 135-2, 136-2, 141-2. The most that can be said is that some of them transacted business with Peck, an officer of a North Dakota corporation, while he was in Peru. This is precisely the kind of "random, fortuitous, or attenuated" contact that cannot form the basis for personal jurisdiction. <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985) (citations and internal quotation marks omitted). Even if any correspondence that APS sent to SKE in North Dakota could be attributable to at least Jorge, Sr. or Jorge, Jr. as APS's designated agents, these infrequent contacts would still come up short. <u>See</u> <u>Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG</u>, 646 F.3d 589, 594 (8th Cir. 2011).

Quantity of contacts becomes relevant where general jurisdiction is alleged. <u>See</u> <u>Lakin v. Prudential Sec., Inc.</u>, 348 F.3d 704, 712 (8th Cir. 2003). Specific jurisdiction, on the other hand, can arise from a single contact with the forum. <u>See</u> <u>Fulton v. Chicago, Rock Island & P. R. Co.</u>, 481 F.2d 326, 334-35 (8th Cir. 1973). There is no cognizable basis for exercising general jurisdiction here. None of the individual Peruvian Defendants is domiciled in North Dakota and neither Convalor nor Confactor is incorporated or has its principal place of business in the state. Thus, they are not "essentially at home" in North Dakota. <u>See</u> <u>Goodyear</u>, 564 U.S. at 919. The third factor, the relation of the contacts with the cause of action, is similarly unhelpful to the Plaintiffs because the events that gave rise to this action and any resulting injuries occurred outside North Dakota.

The secondary factors—the interest of the forum state and the convenience of the parties— are also unfavorable for the Plaintiffs. North Dakota has no conceivable interest in claims against citizens of Peru that arose from business activities in Peru that caused out-of-state injuries to nonresident plaintiffs. The inconvenience of hauling seven defendants away from this case's

epicenter in Peru to a courtroom in North Dakota goes without saying. Weighing all the Eighth Circuit factors, the Court cannot constitutionally exercise personal jurisdiction over the Peruvian Defendants under North Dakota's long-arm statute.

>  2.  Federal Rule of Civil Procedure 4(k)(2)

Notwithstanding the lack of contacts with North Dakota in particular, the Plaintiffs argue more vigorously that the exercise of personal jurisdiction is consistent with Federal Rule of Civil Procedure 4(k)(2), the federal equivalent of a long-arm statute. In addition to requiring proper service, that Rule applies when: (1) the underlying claim arises under federal law; (2) the defendant is not subject to jurisdiction in any other state's court of general jurisdiction; and (3) the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment. Clockwork IP, LLC v. Clearview Plumbing & Heating Ltd., 127 F. Supp. 3d 1020, 1029 (E.D. Mo. 2015) (citing Fed. R. Civ. P. 4(k)(2); Mwani v. bin Laden, 417 F.3d 1, 10 (D.C. Cir. 2005)). While the first two requirements are met, the third is not.

>  a.  Claim Under Federal Law

Unsurprisingly, to support application of Rule 4(k)(2), the claim must arise under federal law. Two Peruvian Defendants, Farah and Convalor, contend there is no claim arising under federal law because the Plaintiffs have failed to state a RICO claim. A recent case in this district found a lack of personal jurisdiction over a civil RICO claim under Rule 4(k)(2) because the plaintiffs there had failed to state a plausible claim for relief against a single defendant. See Energy Transfer Equity, LP v. Greenpeace Int'l, Case No. 1:17-cv-00173-BRW, 2018 WL 4677787, at *5 (D.N.D. July 24, 2018). The Court here, though, will first address the jurisdictional issues without wading into the merits of the RICO claim against the Peruvian Defendants. See Archangel

Diamond Corp. Liquidating Tr. v. OAO Lukoil, 75 F. Supp. 3d 1343, 1361 (D. Colo. 2014).  Four

of the Peruvian Defendants have not addressed the RICO claim's merits, relying solely on lack of

jurisdiction.  See Doc. Nos. 134-37.  In the interest of judicial economy, the Court therefore finds

that the claim arises under federal law regardless of whether the RICO claim is meritorious.

        b.       Not Subject to Jurisdiction in Any State's Court of General Jurisdiction

Rule 4(k)(2)'s second requirement is that a defendant cannot be amenable to personal

jurisdiction in any state specifically.  The Eighth Circuit Court of Appeals has yet to decide which

party bears the burden of proving this jurisdictional void, but most circuits place the burden on the

defendant.  See Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1414 (Fed. Cir. 2009)

(explaining that the Fifth, Seventh, Ninth, Eleventh, and D.C. Circuits have adopted this approach,

with only the First and Fourth Circuits differing); see also Fraserside IP L.L.C. v. Netvertising

Ltd., 902 F. Supp. 2d 1165, 1179 (N.D. Iowa 2012) (presuming the Eighth Circuit would follow

the majority position).  The majority approach as laid out in the leading Seventh Circuit opinion is

straightforward:

> A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other
> state in which the suit could proceed.  Naming a more appropriate state would
> amount to a consent to personal jurisdiction there . . . . If, however, the defendant
> contends that he cannot be sued in the forum state and refuses to identify any other
> where suit is possible, then the federal court is entitled to use Rule 4(k)(2).  This
> procedure makes it unnecessary to traipse through the 50 states, asking whether
> each could entertain the suit.

ISI Int'l, Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001) (citations omitted).

None of the Peruvian Defendants has named another state that could exercise personal jurisdiction

over them.  Exactly the opposite, in fact, because all seven assert they are not subject to personal

jurisdiction anywhere in the United States.  As a result, part two of the Rule 4(k)(2) test is satisfied.

19

c.     Fifth Amendment Due Process

Like under a state long-arm statute, Rule 4(k)(2)'s final requirement is that the exercise of personal jurisdiction comport with due process. "The due process analysis under Rule 4(k)(2) is nearly identical to the traditional personal jurisdiction analysis, the only difference lies in that the forum under analysis shifts . . . to the United States as a whole." Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd., No. C11-3005-MWB, 2013 WL 139510, at *14 (N.D. Iowa Jan. 10, 2013) (citing Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico, 563 F.3d 1285, 1295 (9th Cir. 2009); Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1220 (11th Cir. 2009); Holland Am. Line Inc. v. Wärtsilä N.A., Inc., 485 F.3d 450, 463 (9th Cir. 2007)).

Though strained, the Plaintiffs appear to assert two separate grounds for sufficient minimum contacts with the United States as a whole. They first put forward a laundry list of the Peruvian Defendants' contacts with the United States unrelated to the present action, suggesting general jurisdiction based on "continuous and systematic" contacts with the United States. See Doc. No. 64, pp. 15-38. The Plaintiffs also contend that the Peruvian Defendants, through their awareness of APS and POIT's fraudulent schemes, purposefully directed activities at the United States by knowingly soliciting American investors and shipping goods to the U.S. resulting in injury to the Plaintiffs' U.S. bank accounts and customer relationships, a nod to specific jurisdiction. See Doc. No. 154, pp. 11-12.

Addressing the general jurisdiction argument first, none of the Peruvian Defendants has the requisite "continuous and systematic" contacts to render them "essentially at home" in the United States. See Goodyear, 564 U.S. at 919. Indeed, to find all seven Defendants subject to general jurisdiction under Rule 4(k)(2)—meaning in practical application that they could be

subject to suit in any judicial district in the United States for any claim potentially implicating federal law arising anywhere in the world—would have frightening implications. As the Supreme Court has made clear, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction." Daimler, 571 U.S. at 137. These affiliations consist exclusively of an individual's domicile or a corporation's place of incorporation and principal place of business in all but an "exceptional case." Id. at 139 n.19. The complaint unequivocally states that all seven Defendants are citizens of Peru, with the Costa Defendants and Farah domiciled there and Convalor and Confactor organized there with their principal places of business there. See Doc. No. 1, ¶¶ 16, 20, 21, 22, 24. This all but forecloses the exercise of general jurisdiction, even more so because the Supreme Court has explicitly warned against haling foreign citizens into American courts on a general jurisdiction theory. See Daimler, 571 U.S. at 140-42.

At the same time, the Peruvian Defendants' remaining contacts with the United States fall well short of an "exceptional case." The Plaintiffs have not offered any new contacts between the Peruvian Defendants and the United States since transfer, relying instead on their filings in the District of Columbia. The most comprehensive account of the Peruvian Defendants' contacts with the United States is found in the Plaintiffs' omnibus response to the first wave of motions to dismiss along with its accompanying exhibits. See Doc. No. 64, pp. 15-38. Ignoring the Plaintiffs' frequent digressions that do nothing more than rehash the substantive allegations in the complaint, the Defendants' relevant contacts with the United States as a whole, viewed in the light most favorable to the Plaintiffs, are as follows.

Jorge, Sr.'s Peruvian law firm "does extensive work" for American clients "and advertises in the United States." Id. at 15-16. He is a director of a Peruvian commercial airline that conducts

flights to the United States, and he has travelled to the U.S. for business and leisure often, holding a B1/B2 visitor visa.  Id.  Jorge, Sr. was also a designated agent for APS, which shipped goods to the United States; in that capacity he attended business meetings with the Plaintiffs and other American citizens in Peru.  Id. at 17, 24-25.

Ofelia, too, is a frequent visitor to the United States.  Id. at 27.  She is the majority shareholder in POIT, which conducts business in this country.  Id.  Jorge, Jr. was, like his father, a designated agent for APS, and he is the General Manager for POIT.  Id. at 29.  He has travelled "regularly" to the United States.  Id.

Javier is a partner in the same Peruvian law firm as Jorge, Sr., with similar American clients, and he also serves as a director for other Peruvian corporations that conduct business in the United States.  Id. at 30-31.  He has travelled to the United States for business, pleasure, and medical care.  Id. at 32.  Like Jorge, Sr., Javier attended business meetings with American citizens in Peru.  Id.

Without more, these contacts cannot render the four Costa Defendants "essentially at home" in the United States.  The Plaintiffs' allegations that these Defendants frequently travel to the United States reveal only that they are visitors—the opposite of at home—when in this country.  That they are additionally employees and directors of businesses that deal with American citizens is equally insufficient to subject them to the breathtakingly broad reach of general jurisdiction under the federal long-arm rule.  Due process does not permit the exercise of general jurisdiction over the Costa Defendants.

As to Farah, he owns a textile business, Lancaster, that "advertises its products in English" and may conduct business in the United States.  Id. at 33-34.  He has a daughter enrolled in college

in the United States, and he has obtained medical care here.  Id. at 37.  Perhaps more significantly, the Plaintiffs assert that Farah maintains a bank account and owns a condominium in the United States.  Id.

Similar to the Costa Defendants, Farah's sporadic business and personal contacts with the United States fail to clear the high bar for general jurisdiction.  And even viewing the evidence in the light most favorable to the Plaintiffs, the allegations regarding Farah's bank account and condominium ownership are speculative.  In response, Farah submitted a sworn declaration stating that he does not own and has never owned property in the United States, only that he told Cook he was thinking about purchasing a condominium for his daughter while she attended college but decided against doing so.  Doc. No. 82-1.  Another declaration states that the bank account the Plaintiffs reference belongs to Farah's wife.  Doc. No. 141-2.  On a motion to dismiss for lack of jurisdiction, courts are permitted to consider submissions from both parties and need not blindly treat the Plaintiffs' allegations as true.  See Miller, 528 F.3d at 1090.  Where, as here, the allegations are speculative and are directly contradicted by other competent evidence in the record, the Court finds these suspect contacts insufficient to support general jurisdiction over Farah.

The Plaintiffs fail to allege any contacts with the United States as to Confactor and Convalor other than their connection to Farah and his family.  See Doc. No. 64, pp. 33-38. Contacts must be assessed for each defendant individually, and Farah's personal contacts cannot be imputed to Confactor or Convalor without more.  See Rush, 444 U.S. at 332 (characterizing the assertion of personal jurisdiction based solely on the contacts of another defendant as "plainly unconstitutional").  General jurisdiction under the federal long-arm rule is therefore manifestly inappropriate as to these two defendants.

For specific jurisdiction under Rule 4(k)(2), "the defendant's suit-related conduct must create a substantial connection" with the United States as a whole. Walden v. Fiore, 571 U.S. 277, 284 (2014). The analysis looks at "contacts that the 'defendant himself' creates with the forum" and not merely at the defendant's "contacts with persons who reside there." Id. at 285 (emphasis in original) (quoting Burger King, 471 U.S. at 475). As a result, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." Id. at 286 (citing Rush, 444 U.S. at 332).

Relying on a case from the District of Columbia, the Plaintiffs argue that shipping products to the United States, soliciting American investors, and seeking entry into American markets is enough to subject the Peruvian Defendants to specific jurisdiction pursuant to Rule 4(k)(2). See Citadel Inv. Grp., L.L.C. v. Citadel Capital Co., 699 F. Supp. 2d 303, 315 (D.D.C. 2010). Citadel's facts are plainly distinguishable. There, the defendant itself solicited business relationships in the United States. Id. Juxtapose that with the Plaintiffs' argument, which is that the Peruvian Defendants knew Harten and APS shipped goods to the United States, knew Harten and APS targeted American investors, and knew of Harten and APS's intent to defraud those investors. See Doc. No. 64, pp. 12-15. Missing, however, is any allegation whatsoever that the Peruvian Defendants acted separate and apart from Harten and APS to reach into the United States. Dragging the Peruvian Defendants halfway across the globe to defend these claims based only on their relationship with Harten and APS would patently contravene due process. Instead, these Defendants must have individual, suit-related contacts that demonstrate an intent to purposefully avail themselves of the protection of the laws of the United States. See Hanson v. Denckla, 357 U.S. 235, 253 (1958).

To that end, the Plaintiffs point to Jorge, Sr., Farah, and Javier purportedly vouching for Harten's honesty and business acumen while meeting with the Plaintiffs in Peru. See Doc. No. 64, pp. 24, 32, 35. But this evinces nothing more than incidental contacts with American citizens, not an intentional targeting of the United States. Even less can be said for Ofelia, Jorge, Jr., Confactor, and Convalor in this regard, as there are no specific instances of their participation in any conversations that led to the Plaintiffs' injuries.

Jorge, Sr., Ofelia, and Jorge, Jr.'s status as officers of APS and POIT forms the last basis for the Plaintiffs' argument for specific jurisdiction. See id. at 17, 27, 28. They insinuate that the Peruvian Defendants' employment with and management of the entities that caused their injuries creates jurisdiction. Not so. Even if personal jurisdiction existed over APS or POIT, Jorge, Sr., Ofelia, and Jorge, Jr. cannot be subject to jurisdiction based on their status as corporate officers alone. See Ark. Rice Growers Coop. Ass'n v. Alchemy Indus., Inc., 797 F.2d 565, 574 (8th Cir. 1986) (citations omitted) ("The law is clear that a corporate officer or agent who has contact with the forum state only with regard to the performance of corporate duties does not thereby become subject to jurisdiction in his or her individual capacity."). Thus, exercising specific jurisdiction over the Peruvian Defendants under Rule 4(k)(2) would be inconsistent with due process.

3.    RICO Jurisdiction

The Plaintiffs' last argument for jurisdiction derives from RICO itself. While normally constrained to the same extent as state courts, federal courts can additionally exercise personal jurisdiction when authorized by federal statute. Fed. R. Civ. P. 4(k)(1)(C). Under 18 U.S.C. § 1965(b), RICO provides for nationwide service of process when the "ends of justice require" so long as at least one defendant is otherwise subject to traditional minimum contacts jurisdiction in

the forum.  See Armstrong v. Am. Pallet Leasing Inc., 678 F. Supp. 2d 827, 849-50 (N.D. Iowa 2009).  The Eighth Circuit Court of Appeals has yet to address whether § 1965(b) nationwide service translates into nationwide personal jurisdiction in the RICO context, but the district courts in the Eighth Circuit that have considered the issue have found that it does.  See id.; Golub & Assoc., Inc. v. Long, No. 4:09CV92 JCH, 2009 WL 690118, at *2 (E.D. Mo. Mar. 11, 2009) (citing Gatz v. Ponsoldt, 271 F. Supp. 2d 1143, 1152 (D. Neb. 2003)).  Following that position, and because SKE and Peck have both consented to personal jurisdiction in North Dakota, nationwide jurisdiction under § 1965(b) is available to the Plaintiffs.

Nonetheless, nationwide jurisdiction does not equate to worldwide jurisdiction.  See AmTrust Fin. Servs., Inc. v. Lacchini, 260 F. Supp. 3d 316, 330 n.7 (S.D.N.Y. 2017) (citations omitted) ("RICO does not have a jurisdictional provision authorizing personal jurisdiction . . . over foreign defendants."); CGC Holding Co., LLC v. Hutchens, 824 F. Supp. 2d 1193, 1199 (D. Colo. 2011) (citations omitted) ("RICO does not authorize extraterritorial service of process.").  It is undisputed that the Plaintiffs served the Peruvian Defendants outside the United States.  As a result, § 1965(b) does not authorize personal jurisdiction.

Just as the U.S. District Court for the District of Columbia found, none of the three theories the Plaintiffs have advanced allows the Court to exercise personal jurisdiction.  The Defendants lack the contacts necessary to satisfy due process both with North Dakota specifically and the United States as a whole.  Even RICO's wide-sweeping jurisdictional provision is unavailing because the statute's reach does not extend to foreign defendants.  To sum it up, a citizen of Peru involved in events in Peru could not fairly expect to wind up in a federal courtroom in North

Dakota.  The Court cannot constitutionally exercise personal jurisdiction over Jorge, Sr., Ofelia, Jorge, Jr., Javier, Farah, Confactor, and Convalor.

### C.     Jurisdictional Discovery

As a final effort, the Plaintiffs contend they are entitled to jurisdictional discovery to bolster any shortcomings in their allegations.  Doc. No. 129.  District courts retain discretion to determine when jurisdictional discovery is warranted.  Johnson v. United States, 534 F.3d 958, 964 (8th Cir. 2008); Lakin, 348 F.3d at 713.  Rule 56 of the Federal Rules of Civil Procedure provides "guidance in determining whether to allow discovery on jurisdictional facts."  Johnson, 534 F.3d at 965.  To obtain discovery under Rule 56, a party must submit an affidavit demonstrating: "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."  Id.  "When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery."  Viasystems, 646 F.3d at 598 (internal alteration omitted) (quoting Dever, 380 F.3d at 1074 n.1).

Playing the Plaintiffs' request out demonstrates that jurisdictional discovery is inapposite. Given unbounded discovery, the jurisdictional facts the Plaintiffs seek would amount to more of the same contacts that cannot form the basis for personal jurisdiction.  See Doc. No. 131, p. 6 (requesting discovery related to (1) Defendants' assertions regarding personal jurisdiction generally, (2) Defendants' "visits to, and activities directed toward, the United States," and (3) documents to further support the Defendants' involvement in the alleged racketeering enterprise "directed against the Plaintiffs in the U.S.").  Their motion does not point to any concrete

jurisdictional facts available through discovery. Nor does it explain how those facts, if obtained, would establish personal jurisdiction, either general or specific. The declaration of Troy Swenson, brother to an executive at SKE, is the only affidavit submitted in this forum for the purpose of supporting jurisdictional discovery. Doc. No. 131-1. Following what appears to be a theme for the Plaintiffs, however, the declaration merely repeats the allegation that SKE is recouping its previous losses through illegal means. Not one of the appearing Peruvian Defendants is so much as mentioned in the declaration.

The bottom line is that the Peruvian Defendants are not "essentially at home" in the United States, and their individual deliberate contacts with the United States did not give rise to this litigation. No amount of discovery will cure these defects. The Plaintiffs' conclusory assertions to the contrary do not entitle them to jurisdictional discovery. In the exercise of its discretion, the Court declines to allow the Plaintiffs to conduct jurisdictional discovery.

To recap, the Court lacks jurisdiction both because the Plaintiffs failed to properly serve the Peruvian Defendants and because the exercise of personal jurisdiction would violate due process under the Fifth and Fourteenth Amendments. The Plaintiffs will not be permitted to conduct jurisdictional discovery. Remaining for disposition are Peck and SKE's motions to dismiss for failure to state a claim.

IV.    **FAILURE TO STATE A CLAIM AGAINST PECK AND SKE**

Shifting now to the two domestic Defendants, the Plaintiffs have failed to state a RICO claim against Peck and SKE. The complaint inadequately pleads the predicate acts necessary to demonstrate that Peck and SKE violated 18 U.S.C. § 1962(c). Furthermore, the Plaintiffs have not established a continuous pattern of racketeering activity. Even overlooking these pitfalls, the

Plaintiffs' RICO claim is anchored in Peru, so Peck and SKE's alleged conduct is beyond the statute's reach. Without the RICO claim, the remaining conspiracy and state-law claims against Peck and SKE warrant dismissal as well.

As a starting point, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In turn, Federal Rule 12(b)(6) mandates the dismissal of a claim if the complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). A complaint is facially plausible where its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

A plaintiff must plead facts that show more than mere speculation or possibility that a defendant acted unlawfully. Wilson v. Ark. Dep't of Human Servs., 850 F.3d 368, 371 (8th Cir. 2017) (citing Iqbal, 556 U.S. at 678); McDonough v. Anoka Cnty., 799 F.3d 931, 946 (8th Cir. 2015) (citing Twombly, 550 U.S. at 555). While courts must accept the complaint's factual allegations as true, they are not required to accept a plaintiff's legal conclusions or a "formulaic recitation of the elements of a cause of action." In re Pre-Filled Propane Tank Antitrust Litig., 860 F.3d 1059, 1063 (8th Cir. 2017) (quoting Iqbal, 556 U.S. at 678). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Iqbal, 556 U.S. at 678). In addition, courts must "review the plausibility of the plaintiff's claim as a whole,

not the plausibility of each individual allegation." Whitney v. Guys, Inc., 700 F.3d 1118, 1128 (8th Cir. 2012) (citing Zoltek Corp. v. Structural Polymer Grp., 592 F.3d 893, 896 n.4 (8th Cir. 2010)). Whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." In re SuperValu, Inc., 925 F.3d 955, 962 (8th Cir. 2019) (quoting Hamilton v. Palm, 621 F.3d 816, 818 (8th Cir. 2010)) (in turn quoting Iqbal, 556 U.S. at 679).

When pled, fraud claims must additionally comply with the heightened standard of Federal Rule 9(b), which requires plaintiffs to plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The particularity requirements of Rule 9(b) apply to allegations of mail fraud and wire fraud when used as predicate acts for a RICO claim." Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995) (citations omitted). Rule 9(b) requires a plaintiff to plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." H & Q Props., Inc. v. Doll, 793 F.3d 852, 856 (8th Cir. 2015) (citing Murr, 48 F.3d at 1069). To do so, a plaintiff must identify the "who, what, where, when, and how" of the alleged fraud. United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003). This heightened standard enables a defendant to respond "specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (quoting Commercial Prop. Invs. v. Quality Inns Int'l Inc., 61 F.3d 639, 644 (8th Cir. 1995)).

Enacted to curb the prevalence of organized crime, RICO provides a private right of action to a plaintiff "injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). The Plaintiffs support their RICO claim with an alleged substantive violation of § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To stave off a motion to dismiss, § 1962(c) requires a plaintiff to adequately plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (citations omitted). The Plaintiffs have failed to plausibly allege that Peck and SKE engaged in conduct constituting racketeering activity. Similarly, the complaint does not establish a continuous pattern of racketeering activity.[5]

### A.     Plausibility of RICO Claim

To state a RICO claim, the Plaintiffs must demonstrate that Peck and SKE "participated in the enterprise . . . by committing at least two racketeering (predicate) acts." Aguilar v. PNC Bank, N.A., 853 F.3d 390, 402 (8th Cir. 2017) (quoting United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995)). The Plaintiffs allege predicate acts pursuant to three statutes: mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and money laundering under 18 U.S.C. § 1956, violations of which qualify as racketeering activity. See 18 U.S.C. § 1961(1). "When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual

---

[5] Because the claim falters on these grounds, the Court assumes without deciding that an enterprise exists and that all three Plaintiffs have standing to assert a RICO injury.

use of the mail or wires to further the scheme." H & Q Props., 793 F.3d at 856 (citation omitted).

"The requirements of § 1962(c) must be established as to each individual defendant." Craig

Outdoor Advert., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1027 (8th Cir. 2008) (citations

omitted).

Taking the predicate statutes in turn, the Plaintiffs' lone mail fraud allegation is that an

APS employee sent a sample of product via DHL from Lima, Peru, to one of NDL's customers in

Pollock Pines, California, at Harten's direction. Doc. No. 1, ¶ 174. The Plaintiffs contend this act

furthered the scheme to defraud them because Harten never intended to complete the order. Id.

The wire fraud allegations consist of four emails sent to the Plaintiffs in the District of

Columbia. Harten sent the first three emails in July 2012. The initial message, on July 9,

confirmed receipt of a $120,000 payment from the Plaintiffs and represented that two containers

of product had already shipped when Harten purportedly knew that to be false. Id. ¶ 179. Three

days later, the second message relayed a photograph of quinoa (that Harten apparently had never

purchased) intended to fulfill one of APS's contracts with the Plaintiffs. Id. ¶ 180. And on July

23, Harten solicited $130,000 over and above what the Plaintiffs had already paid, again with no

intent of providing either new product or what he originally promised. Id. ¶ 181. Finally, an APS

employee emailed a photograph of sample beans to Cook on October 11, 2012 "at the behest of

Harten and in furtherance of the scheme to defraud." Id. ¶ 178.

As for money laundering, the Plaintiffs claim that Harten and APS engaged in "unlawful

transactions financed with fraudulently-generated funds" involving two Peruvian banks in Lima

between 2012 and the date of the complaint. Id. ¶ 186. The Plaintiffs also generally allege that

all the named Defendants, including Peck and SKE, directly or indirectly participated in each predicate act.  Id. ¶ 191.

Without needing to pass on the allegations' merits, the complaint is utterly devoid of assertions that either Peck or SKE committed a single predicate racketeering act.  The Plaintiffs likewise do not assert that Peck or SKE aided or abetted in any predicate acts.  Indeed, for all the huffing and puffing in the complaint, Harten, APS, and two of its employees are the only Defendants alleged to have engaged in any instances of mail fraud, wire fraud, or money laundering.  See id. ¶¶ 171-87.  The Plaintiffs' general allegations that Peck and SKE participated in these predicate acts cannot surmount Rule 9(b)'s high bar.  See Crest Constr. II, 660 F.3d at 356 (citing Gallagher v. Magner, 619 F.3d 823, 842 (8th Cir. 2010)) ("While the complaint is awash in phrases such as 'ongoing scheme,' 'pattern of racketeering,' and 'participation in a fraudulent scheme,' without more, such phrases are insufficient to form the basis of a RICO claim.").

On a broader scale, the Plaintiffs have argued to exhaustion that Peck and SKE played a central role in the scheme to defraud them.  But contentions of generally fraudulent or deceptive conduct—true or otherwise—cannot sustain a RICO claim because such conduct is not racketeering activity.  See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 653 (2008) ("Congress chose to make mail fraud, not common-law fraud, the predicate act for a RICO violation.").  Viewed through this narrower prism, the RICO claim against Peck and SKE falls apart because their alleged conduct does not constitute mail or wire fraud.

For example, SKE's supposed racketeering conduct is opaque at best.  The Plaintiffs offer meagerly that SKE must have been in on the scheme to defraud them somehow because it never fired Peck or sued Harten or APS over its $3.6 million loss.  Doc. No. 1, ¶¶ 93, 98.  SKE's President

also told Peck "that his job was on the line and to do whatever it took" to recover the company's lost investment.  Id. ¶ 73.  This conduct plainly does not rise to the level of mail or wire fraud.

The farthest the allegations extend for Peck is that he concealed his status as APS's founder and majority shareholder when he encouraged the Plaintiffs to do business with Harten.  Id. ¶¶ 88-91.  The Plaintiffs additionally assert that Peck and Harten displayed "facially valid SKE purchase orders" to entice unwitting financiers to enter sham contracts with APS.  Id. ¶ 90, 95.  Absent, though, is any indication that these acts involved use of the mail or wires.  The Plaintiffs further rely on an email Peck sent to the Plaintiffs seeking to speak with Harten about a separate contract with the apparent intent to lend faux credibility to Harten.  Id. ¶ 35.  While involving the wires, nothing in the record other than pure speculation supports an inference that Peck intended to advance a scheme to defraud the Plaintiffs with this email.  Such unsubstantiated speculation is insufficient to plead wire fraud "with particularity" as Rule 9(b) requires.

Regardless of verity, then, Peck and SKE's conduct does not constitute mail fraud, wire fraud, or any other RICO predicate act pursuant to § 1961(1).  There are no specific, plausible allegations that either Defendant used the mail or wires with the intent to perpetuate a scheme to defraud the Plaintiffs.  The complaint therefore fails to plead conduct constituting the two predicate acts of racketeering activity necessary to sustain a RICO claim against Peck and SKE.

Also missing from the complaint is a sufficient basis to find that the alleged enterprise plausibly engaged in a pattern of racketeering activity.  "A pattern is shown through two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'"  Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009) (quoting Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999)).  Establishing either closed-ended or open-

ended continuity satisfies this requirement. "Closed-ended continuity involves 'a series of related predicates extending over a substantial period of time;' open-ended continuity involves acts which, by their nature, threaten repetition into the future." Crest Constr. II, 660 F.3d at 356 (quoting Wisdom, 167 F.3d at 407) (in turn quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241-42 (1989)).

The Plaintiffs argue for both closed-ended and open-ended continuity. In support of closed-ended continuity, they contend that the alleged RICO enterprise "was created prior to 2011" and continued at least through the date of the complaint. Doc. No. 1, ¶ 167. Arguing for open-ended continuity, the Plaintiffs claim the enterprise "continues to engage in illegal acts and will do so indefinitely." Id. They point to the formation of POIT to carry on APS's fraudulent activities, as well as attempts to defraud a Peruvian businessman in 2013 and a Dutch company in 2015. Id. ¶¶ 82-84. Neither theory is persuasive.

The closed-ended continuity argument is unavailing because it is the dates of the RICO predicate offenses that determine whether the enterprise acted over a "substantial period of time," not the Plaintiffs' chosen narrative of events. See Craig Outdoor, 528 F.3d at 1028 ("a plaintiff must provide evidence of multiple predicate acts occurring over a substantial period of time") (emphasis added). However unsavory, conduct that is not racketeering activity in the first place cannot illustrate a continuous pattern of racketeering activity. Therefore, as alleged in the complaint, the predicate acts lasted only from July 9, 2012 through October 11, 2012. Doc. No. 1, ¶¶ 178-79. Closed-ended continuity requires predicate acts to span at least one year. Crest Constr. II, 660 F.3d at 357. Accordingly, the three-month window provided in the complaint is not enough to show that racketeering activity occurred over a "substantial period of time." See,

e.g., Wisdom, 167 F.3d at 407 (finding six-month span of predicate acts insufficient); Geraci v. Women's Alliance, Inc., 436 F. Supp. 2d 1022, 1043-44 (D.N.D. 2006) (same).

Open-ended continuity is also foreclosed because the Plaintiffs do not plausibly allege acts that threaten future racketeering activity. A showing of open-ended continuity requires "that the predicate acts themselves involve a distinct threat of long-term racketeering activity or that the predicate acts constitute a regular way of conducting an ongoing legitimate business or a RICO enterprise." Craig Outdoor, 528 F.3d at 1028 (citing H.J. Inc., 492 U.S. at 242-43). By the complaint's own terms, the predicate acts ended in October 2012 and consequently do not pose a threat of long-term racketeering activity. Nor could the purported enterprise—which the Plaintiffs assert endured at minimum from 2011 until 2015—regularly conduct itself through the alleged predicate acts because they lasted a mere three months. Even taking a wider view, the claim that POIT is continuing the RICO enterprise through further fraud to repay APS's debts is vague, and there are no specific instances of POIT engaging in racketeering activity alleged in the complaint. In the same vein, the Defendants' alleged attempts to defraud other victims in 2013 and 2015 fail to demonstrate continuing racketeering activity, instead describing wholly foreign business dealings that fall well outside the scope of the mail and wire fraud statutes.

The Plaintiffs have failed to plausibly allege a continuous pattern of racketeering activity. Added to that, they have not pled that Peck or SKE engaged in any conduct that constitutes a predicate racketeering act. Accordingly, the Plaintiffs RICO claim under § 1962(c) against Peck and SKE must be dismissed.

**B.      Extraterritoriality**

As a separate ground for dismissal, Peck and SKE put forward two differing theories that RICO does not apply extraterritorially under the present circumstances.  SKE asserts that RICO's substantive provision—§ 1962(c) for purposes of this action—cannot support extraterritorial application, claiming the <u>conduct</u> that comprises the claim's predicate acts occurred in Peru.  Peck, meanwhile, contends that RICO's private right of action under § 1964(c) is unavailable altogether because the Plaintiffs suffered a foreign <u>injury</u>.  This distinction becomes important considering the Supreme Court's recent decision addressing RICO's extraterritorial application.  <u>See</u> <u>RJR Nabisco, Inc. v. European Cmty.</u>, 579 U.S. ___, 136 S. Ct. 2090, 2099-2100 (2016) [hereinafter <u>RJR Nabisco</u>].

"It is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" <u>Id.</u> at 2100 (quoting <u>Microsoft Corp. v. AT & T Corp.</u>, 550 U.S. 437, 454 (2007)).  "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  <u>Id.</u> (citing <u>Morrison v. Nat'l Austl. Bank Ltd.</u>, 561 U.S. 247, 255 (2010)).  Applying these principles in <u>RJR Nabisco</u>, the Supreme Court determined that RICO's substantive provision, § 1962, applies to foreign conduct, but only to the extent that the predicate offenses comprising the RICO claim themselves apply extraterritorially.  <u>Id.</u> at 2103.  Conversely, the Court held RICO's private right of action under § 1964(c) cannot be applied extraterritorially, therefore requiring a plaintiff to plausibly allege "a domestic injury to business or property."  <u>Id.</u> at 2111.

1.     Section 1964(c) Private Right of Action

Addressing first the threshold ability to utilize RICO's private right of action under § 1964(c), the Court finds that the Plaintiffs have adequately pled a domestic injury.  The Supreme Court did not parse the distinction between a foreign and domestic injury in RJR Nabisco, stating only that such a determination "will not always be self-evident."  Id.  Similarly, there is no guidance from the Eighth Circuit Court of Appeals as to what constitutes a domestic injury for RICO purposes.  Three other federal appellate courts, however, have addressed the issue.

Beginning in the immediate aftermath of RJR Nabisco, the Second Circuit advocated for a fact-intensive, case-by-case analysis to determine the geographic location of a RICO injury.  See Bascuñán v. Elsaca, 874 F.3d 806, 817-18 (2d Cir. 2017).  The Second Circuit's more limited central holding in Bascuñán, though, was that "an injury to tangible property is generally a domestic injury only if the property was physically located in the United States" when harmed. Id. at 819.  For the locus of injuries to intangible property, on the other hand, the Third and Seventh Circuits have advanced divergent standards.  The Seventh Circuit went with a bright-line rule, holding that "a party experiences or sustains injuries to its intangible property at its residence, which for a corporation . . . is its principal place of business."  Armada (Sing.) PTE Ltd. v. Amcol Int'l Corp., 885 F.3d 1090, 1094 (7th Cir. 2018).  But the Third Circuit rejected this approach, gravitating instead toward the fact-intensive analysis the Second Circuit postulated.  See Humphrey v. GlaxoSmithKline PLC, 905 F.3d 694, 707-09 (3d Cir. 2018).   The Third Circuit went on to enumerate several factors for courts to consider, including:

> where the injury itself arose; the location of the plaintiff's residence or principal place of business; . . .  where any relevant business agreements were entered into and the laws binding such agreements; and the location of the activities giving rise to the underlying dispute.

Id. at 707. While no one factor is dispositive, the Humphrey court's approach focuses "primarily upon where the effects of the predicate acts were experienced." Id. After reviewing both perspectives, the Court finds the Third Circuit's approach in Humphrey, and its reasoning for declining to follow the Seventh Circuit's more rigid test, persuasive. The Court will therefore follow Humphrey's case-by-case approach.

Most recently, the Third Circuit has further developed Humphrey into an instructive three-part test for determining when a RICO plaintiff has suffered a domestic injury. That test requires examination of "(1) the nature of the injury [a plaintiff] claims to have suffered due to Defendants' actions; (2) whether the injured property is tangible or intangible; and (3) where the injury occurred." Cevdet Aksut Ve Ogullari Koll.Sti v. Cavusoglu, 756 F. App'x 119, 123 (3d Cir. 2018). The test's third part incorporates the Bascuñán analysis when the injured property is tangible and the Humphrey factors when it is intangible. Id.

Applying this test, the nature of the Plaintiffs' injuries as alleged consists of just north of $2 million in losses from U.S. bank accounts as well as unspecified lost business opportunities with U.S. customers. Doc. No. 1, ¶¶ 192-93. These are intangible injuries. See Mullin v. Travelers Indem. Co. of Conn., 541 F.3d 1219, 1223-24 (10th Cir. 2008) (collecting cases describing bank-account funds as intangible property); Humphrey, 905 F.3d at 708 (treating loss of U.S. customers as intangible property interest). Thus, analysis under the Humphrey factors is necessary to determine if the Plaintiffs have suffered a domestic injury.

To reiterate, the Plaintiffs' allegations must be taken as true at the pleading stage. The Defendants' characterizations of the nature or location of any injuries are irrelevant. Mindful of that, weighing in favor of a domestic injury is Humphrey's "primary" consideration because the

39

Plaintiffs felt the effects of the predicate acts on their U.S. bank accounts and in the loss of U.S. customers. NDL and NDP's principal places of business are likewise in the United States. The remaining factors cut towards a foreign injury. Specifically, the injuries arose from contracts that were entered into and executed entirely in Peru and governed by Peruvian law. Though a close call, the Court finds that dismissal on this ground would be inappropriate. The two factors most important to both the Third and Seventh Circuits (where a plaintiff felt the effects of the predicate acts and where a plaintiff has its principal place of business) trend in the Plaintiffs' favor. The Court therefore finds that the Plaintiffs have plausibly alleged a domestic injury for RICO purposes. Accordingly, extraterritoriality concerns do not preclude the Plaintiffs' use of § 1964(c)'s private right of action.

2.     Section 1962(c) Predicate Acts

Even with an adequately pled domestic injury, however, the predicate acts sustaining the Plaintiffs' RICO claim—§ 1341 mail fraud, § 1343 wire fraud, and § 1956 money laundering— cannot apply extraterritorially as alleged, and so the claim fails for this reason as well. Heeding the Supreme Court's mandate in RJR Nabisco, the task is to determine whether the three statutes providing the predicate acts themselves support extraterritorial application under the circumstances. See RJR Nabisco, 136 S. Ct. at 2103.

As an initial requirement, "a RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States" to permit § 1962's application at all. Id. at 2105. The alleged RICO enterprise here meets this basic requirement in that the Defendants engage in commerce affecting the United States. Beyond that, the RJR Nabisco Court succinctly set forth a two-step framework to determine if a predicate statute applies extraterritorially. Id. at

2101; see also Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 124-25 (2013); Morrison, 561 U.S. at 266. The first step asks "whether the statute gives a clear, affirmative indication that it applies extraterritorially." RJR Nabisco, 136 S. Ct. at 2101. If it does not, the second step looks to "whether the case involves a domestic application of the statute." Id. Justice Alito's opinion explained the second step this way:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

Id. Under this framework, the Plaintiffs' RICO claim stumbles.

As pertinent here, the RJR Nabisco framework's first step requires looking to the mail fraud, wire fraud, and money laundering statutes to discern whether there is clear congressional intent that they apply extraterritorially. Notably, the same three statutes were at issue in RJR Nabisco. While not passing on their extraterritorial application directly, the Supreme Court left undisturbed the Second Circuit Court of Appeals' decision below. See id. at 2105. In that earlier proceeding, the Second Circuit held that neither the mail fraud statute nor the wire fraud statute clearly expresses an intent for extraterritorial application. European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 140-41 (2d Cir. 2014), rev'd on other grounds, 579 U.S. ___, 136 S. Ct. 2090 (2016) [hereinafter European Community]. The Court agrees with the Second Circuit's position that §§ 1341 and 1343 do not rebut the presumption against extraterritoriality. The money laundering statute, though, plainly manifests an intent to apply to extraterritorial conduct in limited circumstances. See 18 U.S.C. § 1956(f)(1); see also European Cmty., 764 F.3d at 140. To support

a RICO claim, then, the Plaintiffs must plausibly allege a domestic application of the mail or wire fraud statutes or a permissible extraterritorial application of the money laundering statute.

With a dearth of case law in the Eighth Circuit, two decisions from the Second Circuit chart a course for resolving whether the Plaintiffs have alleged a domestic application of the mail or wire fraud statutes. The first is European Community itself. There, the Second Circuit decided not to draw a finite line between domestic and extraterritorial application. Id. at 142. In the end, the facts presented a straightforward domestic application because the defendants hatched and executed the underlying fraudulent scheme entirely within the United States. Id. So, when "domestic conduct satisfies every essential element" of a predicate offense, the mail and wire fraud statutes apply domestically without hesitation. Id.

Now compare that scenario with a subsequent Second Circuit case where a wire fraud scheme formed and carried out in Mexico obtained financing in the United States and conducted its fraudulent transactions through U.S. banks. See Petroleos Mexicanos v. SK Eng'g & Constr. Co. Ltd., 572 F. App'x 60, 61 (2d Cir. 2014). In that case, the court found the domestic conduct insufficient because "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States." Id. With these two opinions as guideposts, district courts have found impermissible extraterritorial application of the mail and wire fraud statutes on facts that align "closer to Petroleos than European Community." Worldwide Directories, S.A. De C.V. v. Yahoo! Inc., 14-cv-7349 (AJN), 2016 WL 1298987, at *10 (S.D.N.Y. Mar. 31, 2016); see also United States v. Prevezon Holdings LTD., 122 F. Supp. 3d 57, 71-72 (S.D.N.Y. 2015).

That represents the situation here. Without question, the Defendants hatched any alleged scheme to defraud the Plaintiffs in Peru. The conduct underlying the predicate acts also occurred abroad. For instance, the purportedly fraudulent samples and photographs as well as Harten's apparently false representations to the Plaintiffs originated from Peru. <u>See</u> Doc. No. 1, ¶¶ 174, 178-81. True enough, the United States was the end point for the predicate acts. But fewer than all the essential elements of mail and wire fraud occurred in the United States, and the activities underlying the scheme took place in Peru. As a result, wielding the mail and wire fraud statutes in this case would result in their impermissible extraterritorial application.

In contrast, the money laundering statute does apply extraterritorially, but only if "the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States." 18 U.S.C. § 1956(f)(1); <u>see also</u> <u>European Cmty.</u>, 764 F.3d at 139-40. Because Congress has restricted extraterritorial application to those specified instances, the Plaintiffs' money laundering predicate must allege acts committed either within the United States or by a United States Citizen. This they have not done. The complaint contends that Harten and APS, both Peruvian citizens, consummated the allegedly illegitimate transactions through two Peruvian banks in Lima.[6] The money laundering statute does not apply extraterritorially under these circumstances.

The Plaintiffs have not sufficiently pled that Peck and SKE engaged in racketeering activity or demonstrated a continuous pattern of racketeering activity. More broadly, the complaint fails to allege the violation of any RICO predicate statute that can support a domestic or permissible extraterritorial application. That means the § 1962(c) RICO claim itself is impermissibly

---

[6] Again, boilerplate assertions that other Defendants participated in the predicate acts, without more, are insufficient. <u>See</u> <u>Crest Constr. II</u>, 660 F.3d at 356.

extraterritorial.  See RJR Nabisco, 136 S. Ct. at 2103.  Therefore, the RICO claim against Peck and SKE fails.

## C.    RICO Conspiracy

The second count of the complaint charges a violation of 18 U.S.C. § 1962(d), conspiracy to violate RICO.  To vindicate such a claim, the Plaintiffs must adequately plead that SKE and Peck "manifested an agreement to participate directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes."  United States v. Bennett, 44 F.3d 1364, 1374 (8th Cir. 1995).  "A civil RICO conspiracy claim under 18 U.S.C. § 1962(d) cannot survive if . . . the plaintiff has failed to allege the requisite substantive elements of RICO."  Rolfes v. MBNA Am. Bank N.A., 416 F. Supp. 2d 745, 754 (D.S.D. 2005) (citing Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 954 (8th Cir. 1999)); see also Bowman v. W. Auto Supply Co., 985 F.2d 383, 388 (8th Cir. 1993) (requiring commission of a predicate racketeering act to bring § 1962(d) RICO conspiracy claim).  As explained above, the complaint fails to plausibly allege any RICO predicate violations or a continuous pattern of racketeering activity.  The RICO conspiracy claim against Peck and SKE thus requires dismissal.

## D.    State-Law Claims

The complaint's last three counts allege conspiracy to commit fraud, fraud, and breach of contracts,[7] presumably under District of Columbia law.  The Plaintiffs base jurisdiction over these state-law claims solely on supplemental jurisdiction.  See Doc. No. 1, ¶ 2.  A district court "may decline to exercise supplemental jurisdiction" over a state-law claim when it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  When authorized by

---

[7] The complaint asserts a breach of contracts claim against Peck, but not SKE.  See Doc. No. 1, ¶¶ 222-28.

44

statute, the ability to decline supplemental jurisdiction is committed to a district court's discretion. See McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994); Packett v. Stenberg, 969 F.2d 721, 726-27 (8th Cir. 1992). With the RICO and RICO conspiracy claims dismissed, no compelling reasons remain to adjudicate the common-law claims in federal court. In its discretion, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' state-law claims against Peck and SKE.

## V. <u>CONCLUSION</u>

The Court has carefully reviewed the entire record, the parties' filings, and the relevant case law. For the reasons above, the Defendants' motions to dismiss (Doc. Nos. 133-38, 141-42) are **GRANTED**. The Court **ORDERS** that Jorge, Sr., Ofelia, Jorge, Jr., Javier, Farah, Convalor, and Confactor are hereby **DISMISSED** from this action for lack of jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. The Plaintiffs' motion to conduct jurisdictional discovery (Doc. No. 129) is **DENIED**. The Court further **ORDERS** that the RICO claim under 18 U.S.C. § 1962(c) and the RICO conspiracy claim under 18 U.S.C. § 1962(d) against SKE and Peck are hereby **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court further **ORDERS** that the state-law claims against SKE and Peck are hereby **DISMISSED** because the Court declines to exercise supplemental jurisdiction over them. Considering the extensive briefing submitted, the Plaintiffs' motion for hearing (Doc. No. 156) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 2nd day of December, 2019.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court